1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11

ANDREW A. CEJAS,

Case No.:  18-cv-00543-WQH (JLB)

12

Plaintiff,

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

13

v.

14

ROBERT BROWN, et al.,

15

Defendants.

**[ECF No. 74]**

16

17

18

    Plaintiff Andrew A. Cejas ("Plaintiff" or "Cejas"), a state prisoner proceeding *pro*

19

*se* and *in forma pauperis*, brings this civil rights action pursuant to 42 U.S.C. § 1983.  (ECF

20

Nos. 1, 13.)  Plaintiff's complaint alleges that from 2016 through 2018, officials at the

21

Richard J. Donovan Correctional Facility ("RJD") imposed a substantial burden on the

22

exercise of his Buddhist faith in violation of the First Amendment and the Religious Land

23

Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*, and denied

24

him equal protection of the law in violation of the Fourteenth Amendment.  (*See* ECF No.

25

1 at 22–34.)  Presently before the Court is a motion for summary judgment filed by

26

Defendants F. Hadjadj, R. Brown, J. Davies, and P. Covello (collectively, "Defendants").

27

(ECF No. 74.)  Plaintiff opposes Defendants' motion.  (ECF Nos. 90, 97.)

28

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.3 of the Local Rules of Practice for the United States District Court for the Southern District of California. After a thorough review of Defendants' motion, Plaintiff's opposition and objections, the record in this case, and the applicable law, the Court hereby **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment.

## I.    BACKGROUND

### A.    Allegations in Plaintiff's Complaint

Plaintiff commenced this 42 U.S.C. § 1983 civil rights action on March 15, 2018. (ECF No. 1; *see also* ECF Nos. 3, 10.)  In his complaint, Plaintiff claims that Defendants imposed a substantial burden on the exercise of his Buddhist faith in violation of the First Amendment and RLUIPA and denied him equal protection of the law in violation of the Fourteenth Amendment.  (*See* ECF No. 1 at 22–34.)[1]

Plaintiff alleges that he has been a serious and sincere Buddhist practitioner for over ten years.  (*Id.* at 23–24.)  He adheres to all mandates and participates in all religious acts which are prescribed by Buddhist law and consistent with his imprisonment.  (*Id.* at 23.) Plaintiff's Buddhist faith mandates meditation, chanting, and prostration, in an indoor setting.  (*Id.* at 24.)  Plaintiff alleges that meditation must be learned from a master and, without personal supervision, it cannot be properly undertaken.  (*Id.*)  Plaintiff and his fellow Buddhist practitioners at RJD use the chapel as a monastery and rely on the "more advanced meditator prisoners" to teach the others, unless a volunteer or monk visits the chapel. (*Id.*)

///

---

[1]    In his complaint, Plaintiff sought to bring this action on behalf of a similarly situated class of Buddhist prisoners.  (ECF No. 1 at 11.)  However, the Court denied Plaintiff's request for class certification pursuant to Federal Rule of Civil Procedure 23 in its July 20, 2018 screening order.  (ECF No. 13 at 5–6.)  Accordingly, Plaintiff is proceeding as an individual plaintiff in this matter.

Plaintiff alleges that Buddhists are scheduled for weekly chapel access at RJD, but weekly chapel access is denied. (*Id.* 16–17, 24–34.) On Facility D, where Plaintiff was housed,[2] Buddhists were scheduled for services on Mondays from 9:20 a.m. through 11:30 a.m. (*Id.* at 24.) Plaintiff claims that Defendants had a duty to provide supervision for Buddhist services, but failed to do so "from 2016 through 2018 and now." (*Id.* at 25–34.) The failure of Defendants to provide supervision led to the denial of weekly chapel access, which Plaintiff claims substantially burdened the exercise of his Buddhist faith. (*Id.* at 9–10, 17, 24–34.)

Plaintiff further claims that Defendants, who had a responsibility to guarantee weekly Buddhist services, failed to make alternative accommodations for when the supervising chaplain[3] or Buddhist volunteers failed to show up for services. (*Id.* at 9–14, 25–30.) Plaintiff suggests that alternative accommodations, such as designating an inmate minister or hiring a Buddhist chaplain, were available. (*Id.* at 16–18, 26, 32.) Plaintiff alternatively suggests that, in the absence of chapel access, Defendants should have provided other weekly indoor accommodations for Buddhist services, such as the dining hall, housing unit's dayroom, or empty classrooms. (*Id.* at 29–30.)[4]

Lastly, Plaintiff alleges that Defendants favor other religions by granting them a guaranteed weekly service and weekly chaplain supervision in violation of the Equal

///

---

[2]     At the time he filed his complaint, Plaintiff was incarcerated at RJD. (ECF No. 1.) He arrived at RJD in 2013. (ECF Nos. 3 at 42; 97-3 at 28.) He was first incarcerated on Facility C and then Facility D. (ECF Nos. 3 at 42; 97-3 at 28.) On November 21, 2019, Plaintiff filed a Notice of Change of Address, notifying the Court that he had been transferred to Avenal State Prison. (ECF No. 64.)

[3]     Plaintiff alleges that defendant Hadjadj was the supervising chaplain, but that he failed to act by not showing up for Buddhist services. (ECF No. 1 at 13–14, 25.) Plaintiff claims that even if defendant Hadjadj did show up, he was an hour or more late, which resulted in the inmates being denied their scheduled time. (*Id.* at 25.)

[4]     Plaintiff does not suggest how the services in these alternative locations would be supervised or suggest that supervision was even required.

18-cv-00543-WQH (JLB)

Protection Clause.  (*Id.* at 28, 33.)  He also alleges that Defendants violated RLUIPA by failing to provide food at state expense for Buddhist holidays.  (*Id.* at 31.)

With respect to Defendants, Plaintiff alleges that defendant Covello, as Chief Deputy Warden, is responsible for policy operation at RJD and is the "moving force behind [California Department of Corrections and Rehabilitation ("CDCR")] policies." (*Id.* at 12.) He also alleges that defendant Brown, as the Community Resource Manager at RJD, is "the policy maker for all religious groups, chapel schedules, religious items, religious approved holiday and religious banquets" and "oversees all religious programs." (*Id.* at 13.)  In addition, Plaintiff alleges that defendant Hadjadj, who is a Jewish Rabbi at RJD, is also responsible for overseeing Buddhist services, and that defendant Davies, an "A/A/PIO," is personally involved in the supervision of defendants Brown and Hadjadj "in directing them to communicate and cover Buddhist services weekly." (*Id.* at 13–14, 19.)

## B.  Facility D Buddhist Chapel Services

From 2016 through 2018, weekly Buddhist services on Facility D at RJD "were to be supervised by brown card volunteers,[5] or by the Jewish Chaplain if a volunteer was not available." (ECF No. 97-2 at 67.)  Defendant Brown, as the Community Resources Manager at RJD,[6] was responsible for coordinating chaplain supervision and specifically assigned the Jewish Chaplain to supervise the Buddhist services when a brown card volunteer was unavailable.  (*Id.* at 69.)  In his position, Defendant Brown "worked closely with the brown card volunteers to provide consistent and meaningful services.  [He] also recruited and provided more brown cards to the Buddhist volunteers." (*Id.* at 70.)

---

[5] Per the CDCR Volunteer Handbook: "Volunteers begin with an escorted status referred to as a 'gate clearance.'  Upon approval and with six months of regular service to inmates, volunteers may be given unescorted status and provided with a Volunteer Identification Card (commonly referred to as a 'Brown Card.')  Determination regarding Brown Card status is made at the institutional level by the warden or designee. All access to institutions is renewed on a regular basis."  (ECF No. 97 at 326.)

[6] Defendant Brown left his position as the Community Resource Manager on January 5, 2018.  (ECF No. 97-2 at 69.)

Between July 25, 2016 and May 6, 2019, the Weekly Reports of Chapel Services Meeting for Facility D ("Weekly Chapel Reports") at RJD indicate that Facility D held Buddhist chapel services as follows:[7]

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 7/25/16[8] | Yes | |
| 8/1/16 | Yes | |
| 8/8/16 | Yes[9] | |
| 8/15/16 | Yes | |
| 8/22/16 | Yes | |
| 8/29/16 | No | No Show |
| 9/5/16 | No | Holiday (Labor Day)/No volunteer available |
| 9/12/16 | No | No show |
| 9/19/16 | Yes | |
| 9/26/16 | Unknown[10] | |
| 10/3/16 | Yes | |
| 10/10/16 | Yes | |
| 10/17/16 | Yes | |
| 10/24/16 | Yes | |
| 10/31/16 | No | No show |

---

[7]     The Court addresses the admissibility of the Weekly Chapel Reports below. All of the information in this chart derives from the Weekly Chapel Reports unless otherwise noted.

[8]     The Weekly Chapel Reports submitted by the parties do not date back to the beginning of 2016.  However, Plaintiff filed CDCR 22 forms indicating that Buddhist services were not held on the following dates: May 23, 2016, May 30, 2016, July 4, 2016, and July 11, 2016.  (ECF No. 97-2 at 98–100.)  Plaintiff also indicated that although the Buddhist volunteer showed up on June 6, 2016, he and others were not released for service. (*Id.* at 99.)

[9]     The Weekly Chapel Reports for August 8, 15, and 22, 2016 were only attached to Plaintiff's opposition and were missing from Defendants' motion for summary judgment. (*See* ECF No. 97 at 362–64.)

[10]     No Weekly Chapel Report was submitted for this week.  However, Plaintiff claims there was no group worship on September 26, 2016.  (ECF No. 97 at 112.)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 11/7/16 | Yes | |
| 11/14/16 | Yes | |
| 11/21/16 | Yes | |
| 11/28/16 | Yes | |
| 12/5/16 | No | No show |
| 12/12/16 | Yes | |
| 12/19/16 | Yes | |
| 12/26/16 | No | Holiday (Christmas) |
| 1/1/17 | Yes | |
| 1/9/17 | Yes | |
| 1/16/17 | Yes | |
| 1/23/17 | Yes | |
| 1/30/17 | No | No show |
| 2/6/17 | Yes | |
| 2/13/17 | Yes (4-4) | |
| 2/20/17 | Yes (7-1) | |
| 2/27/17 | Yes (1-3) | |
| 3/6/17 | Yes (4-1) | |
| 3/13/17 | Yes (4-2)[11] | |
| 3/20/17 | Yes (5-1) | |
| 3/27/17 | No | No show |
| 4/3/17 | No | No lists from program office |
| 4/10/17 | No | No show |
| 4/17/17 | Yes (4-2)[12] | |
| 4/24/17 | No | No show |
| 5/1/17 | Yes (5-1) | |
| 5/8/17 | No | No show |
| 5/15/17 | Yes (5-2) | |
| 5/22/17 | No | No show |
| 5/29/17 | No | Holiday (Memorial Day) |

[11]     Plaintiff filed a CDCR 22 form indicating that a Buddhist service was not held on March 13, 2017.  (*See* ECF No. 97-2 at 102; *see also* ECF No. 97 at 104, 115.)

[12]     Plaintiff filed a CDCR 22 form indicating that a Buddhist service was not held on April 17, 2017.  (*See* ECF No. 97-2 at 103; *see also* ECF No. 97 at 116.)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 6/5/17 | No | No show |
| 6/12/17 | No | No show |
| 6/19/17 | Yes (4-2) | |
| 6/26/17 | No | No show |
| 7/3/17 | Yes (5-1) | |
| 7/10/17 | No | No show |
| 7/17/17 | No | No show |
| 7/24/17 | Yes (1-1) | |
| 7/31/17 | Yes (3-1) | |
| 8/7/17 | Yes (2-4) | |
| 8/14/17 | No | No show[13] |
| 8/21/17 | Yes (6-3) | |
| 8/28/17 | Yes (3-1) | |
| 9/4/17 | Yes (11-1) | |
| 9/11/17 | Yes (3-1) | Temp changed to 9/13/17 |
| 9/18/17 | Yes (7-1)[14] | |
| 9/25/17 | Yes (7-1) | |
| 10/2/17 | Yes (7-1) | |
| 10/9/17 | Yes (5-1)[15] | |
| 10/16/17 | Yes (8-2) | |
| 10/23/17 | Yes (5-1) | |
| 10/30/17 | Yes (9-1) | |
| 11/6/17 | Yes (6-2) | |

---

[13]     Per P. Covello, in a Second Level Appeal Response (Log No. RJD-D-17-03023) to Plaintiff, a review of Facility D Chapel Reports from 7/24/17 to 8/21/17 demonstrated that the "Buddhist community had services and coverage by a chaplain or volunteer every week, except the week of 8/[1]4/17." (*See* ECF No. 3 at 12.)

[14]     Plaintiff filed a CDCR 22 form indicating that he was not released for the Buddhist service on September 18, 2017 and September 25, 2017. (*See* ECF Nos. 1 at 21; 97 at 105–06; 97-2 at 106.)

[15]     Plaintiff filed a CDCR 22 form indicating that on October 9, 2017, the inmates were called out for the Buddhist service around 9:20 a.m. and arrived at the chapel only to find there was no one there to supervise and were therefore sent back to their cells around 10:00 a.m. (*See* ECF No. 97-2 at 107; *see also* ECF No. 97 at 106.)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 11/13/17 | Yes (6-1) | |
| 11/20/17 | Yes (7-3) | |
| 11/27/17 | Yes (4-5) | |
| 12/4/17 | No | No show |
| 12/11/17 | Yes (6-1) | |
| 12/18/17 | Yes (5-3) | |
| 12/25/17 | No | No service (Christmas) |
| 1/1/18 | No | No service due to holiday (New Year's Day) |
| 1/8/18 | No | No show |
| 1/15/18 | No | No show |
| 1/22/18 | Yes (7-1)[16] | |
| 1/29/18 | No | No show |
| 2/5/18 | No | No program by Sgt. |
| 2/12/18 | No | No service due to program |
| 2/19/18 | Unknown[17] | |
| 2/26/18 | Unknown | |
| 3/5/18 | No | No service |
| 3/12/18 | No | No show |
| 3/19/18 | Yes (6-1) | |
| 3/26/18 | Yes (6-1) | |
| 4/2/18 | No | No show |
| 4/9/18 | Yes (8-3) | |
| 4/16/18 | No | No show |
| 4/23/18 | No | Late[18] |
| 4/30/18 | No | No show |

[16]     Plaintiff claims that Defendant Hadjadj did not show up to supervise this service. (ECF No. 97 at 99, 106–07, 122; *see also* ECF No. 97-3 at 29.) However, other records indicate it was held and Cejas did not attend. (ECF No. 97-1 at 109.)

[17]     No records were submitted for the weeks of February 19, 2018 and February 26, 2018. Plaintiff contends that Buddhist services were not held on these weeks. (ECF Nos. 97 at 122; 97-3 at 82.)

[18]     Additional records indicate that the volunteer did not show up until 11:45 a.m. (ECF Nos. 74-1 at 90; 97-1 at 119.)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 5/7/18 | No | No show |
| 5/14/18 | No | No show |
| 5/21/18 | No | No show |
| 5/28/18 | Yes (10-2) | No show on 5/28/18 (Memorial Day).  Service held on 5/30/18.[19] |
| 6/4/18[20] | Yes (7-1) | No service held on 6/4/18. Service held on 6/5/18. |
| 6/11/18 | Yes (6-1) | Held on 6/12/18 |
| 6/18/18 | Yes (5-2) | Held on 6/19/18 |
| 6/25/18 | Yes (6-2) | Held on 6/26/18 |
| 7/2/18 | Yes (7-2) | Held on 7/3/18 |
| 7/9/18 | Yes (10-1) | Held on 7/10/18 |
| 7/16/18 | Yes (7-1) | Held on 7/17/18 |
| 7/23/18 | Yes (6-1) | Held on 7/24/18 |
| 7/30/18 | No | No program |
| 8/6/18 | Yes (8-1) | Held on 8/7/18 |
| 8/13/18 | Yes (9-1) | Held on 8/14/18 |
| 8/20/18 | Yes (10-1) | Held on 8/21/18 |
| 8/27/18 | Yes (10-1) | Held on 8/28/18 |
| 9/3/18 | Yes (10-1) | Held on 9/4/18 |
| 9/10/18 | Yes (6-0) | Held on 9/11/18 |
| 9/17/18 | Yes (5-0) | Held on 9/18/18 |
| 9/24/18 | Yes (10-0) | Held on 9/25/18 |
| 10/1/18 | Yes (5-0) | Held on 10/2/18 |
| 10/8/18 | Yes (8-1) | Held on 10/9/18[21] |

--------

[19]     *See* ECF Nos. 74-1 at 95 (indicating service held on 5/30/18); 97-1 at 124 (indicating service held on 5/31/18).

[20]     On or about June 5, 2018, weekly Buddhist services switched from Mondays to Tuesdays.  (*See* ECF Nos. 97 at 100, 208; 97-1 at 125; *see also* ECF Nos. 74-1 at 97–98; 97-3 at 82.)

[21]     There was no properly dated Weekly Chapel Report submitted for this week. (*But see* ECF No. 97-1 at 74.)  However, weekly sign-in records indicate—and Plaintiff does not dispute—that a service was held.  (ECF Nos. 97-1 at 145; 97 at 128.)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 10/15/18 | Yes (8-1) | Held on 10/16/18 |
| 10/22/18 | No | No service |
| 10/29/18 | Yes (7-0) | Held on 10/30/18[22] |
| 11/5/18 | Yes (7-1) | Held on 11/6/18 |
| 11/12/18 | Yes (8-1) | Held on 11/13/18 |
| 11/19/18 | Yes (8-1) | Held on 11/20/18 |
| 11/26/18 | Yes (7-2) | Held on 11/27/18 |
| 12/3/18 | Yes (8-1) | Held on 12/4/18 |
| 12/10/18 | Yes (10-2) | Held on 12/11/18 |
| 12/17/18 | Yes (5-1) | Held on 12/18/18 |
| 12/24/18 | No | Scheduled for 12/25/18 (Christmas) |
| 12/31/18 | No | Scheduled for 1/1/19 (New Year's Day) |
| 1/7/19 | Yes (6-2) | Held on 1/8/19 |
| 1/14/19 | Yes (5-1) | Held on 1/15/19 |
| 1/21/19 | Yes (4-1) | Held on 1/21/19 |
| 1/28/19 | Yes (5-1) | Held on 1/29/19 |
| 2/4/19 | Yes (5-0) | Held on 2/5/19 |
| 2/11/19 | Yes (4-1) | Held on 2/12/19 |
| 2/18/19 | Yes (4-1) | Held on 2/19/19 |
| 2/25/19 | No | No service |
| 3/4/19 | Yes (9-1) | Held on 3/8/19 |
| 3/11/19 | Yes | Held on 3/15/19 |
| 3/18/19 | Yes (3-1) | Held on 3/19/19 |
| 3/25/19 | No | Fog day |
| 4/1/19 | Yes (4-1) | Held on 4/2/19[23] |
| 4/8/19 | Yes (2-1) | Held on 4/9/19 |
| 4/15/19 | Yes (1-1) | Held on 4/16/19 |

---

[22]    No Weekly Chapel Report was submitted for this week.  However, weekly sign-in records indicate—and Plaintiff does not dispute—that a service was held.  (ECF Nos. 97-1 at 148; 97 at 128.)

[23]    The Weekly Chapel Reports indicate that *additional* weekly services were held on April 5, 12, 19, 26 2019.  (*See* ECF No. 74-1 at 138–41.)

18-cv-00543-WQH (JLB)

| Date (Week Of) | Buddhist Service Met: Yes or No (# of Inmates and Volunteers) | Notes |
|---|---|---|
| 4/22/19 | Yes (3-1) | Held on 4/23/19 |
| 4/29/19 | Yes (4-1) | Held on 4/30/19 |
| 5/6/19 | No | No service |

(ECF No. 74-1 at 1–142; *see also* ECF Nos. 97 at 360–99; 97-1 at 1–103.)  The weekly sign-in sheets, which Plaintiff claims are true and correct copies of prisoner clerk reports, support the Weekly Chapel Reports.  (*See* ECF Nos. 97 at 72; 97-1 at 105–53.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers a court to enter summary judgment on factually unsupported claims or defenses to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate if the materials in the record, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc).

Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3).  If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  An affidavit will not suffice to create a genuine issue of material fact if it is

1  "conclusory, self-serving . . . [and] lacking detailed facts and any supporting evidence."

2  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

3       The moving party bears the initial burden of demonstrating the absence of a genuine

4  issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

5  A fact is material if it could affect the outcome of the suit under the governing substantive

6  law. *Id.* at 248. Where, as here, the opposing party will have the burden of proof at trial,

7  the moving party need only point out "that there is an absence of evidence to support the

8  nonmoving party's case." *Celotex*, 477 U.S. at 325.

9       When a defendant seeking summary judgment has carried its burden under Rule

10  56(c), the burden shifts to the plaintiff who "must do more than simply show that there is

11  some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380

12  (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87

13  (1986)). The plaintiff "must come forward with specific facts showing that there is a

14  *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal citation omitted). If the

15  plaintiff fails to make a sufficient showing of an essential element of its case, the defendant

16  is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23. In ruling on a

17  motion for summary judgment, the nonmoving party's evidence is to be believed, and all

18  justifiable inferences are to be drawn in that party's favor. *Anderson*, 477 U.S. at 255.

19  **III.   DISCUSSION**

20       **A.   Admissibility of Weekly Reports of Chapel Service on Facility D**

21       Defendants attach the Weekly Chapel Reports at RJD for the period from

22  July 25, 2016 to April 29, 2019 to the Declaration of John P. Walters filed in support of

23  their motion for summary judgment. (ECF No. 74-1 at 1–2, ¶ 2, Exh. 4.) Mr. Walters

24  received these Weekly Chapel Reports "[a]s part of the litigation of this case." (*Id.*)

25  Mr. Walters states that these Weekly Chapel Reports are "generated and maintained by

26  [CDCR] at [RJD]" and "detail[] the chapel services for various religious groups that were

27  scheduled each week on that facility." (*Id.*)

28

After filing their motion for summary judgement, Defendants filed a separate declaration from the Litigation Coordinator at RJD, L. Garnica ("Garnica"). (ECF No. 96.) Garnica states that CDCR at RJD creates and maintains the Weekly Chapel Reports. (*Id.* at 2.) Garnica adds that the reports are regularly created and kept at the prison and that he is familiar with them. (*Id.*) Garnica further states that the reports detail the chapel services for various religious groups that were scheduled each week on Facility D at RJD, and that a true and correct copy of the Weekly Chapel Reports for the period from July 25, 2016 to April 29, 2019 were attached to Mr. Walters' declaration. (*Id.*)

In support of his opposition, Plaintiff attaches a true and correct copy of the same Weekly Chapel Reports to his declaration.[24] (ECF No. 97 at 72, ¶¶ 2, 4; Exh. K (ECF No. 97 at 359–399 to ECF No. 97-1 at 103).) Plaintiff states that he received these records from Mr. Walters through discovery in this case. (*Id.* at 72, ¶ 2.) Plaintiff further states that the records were generated and maintained by prisoners that were chapel clerks and detail the weekly chapel services for various religious groups that were scheduled each week by defendant Brown for Facility D. (*Id.*)

Although he attaches these records to his opposition, Plaintiff objects to the admission of the Weekly Chapel Reports for purposes of considering Defendants' motion for summary judgment, arguing they have not been properly authenticated. (*Id.* at 73, ¶ 7; *see also* ECF No. 90.) Plaintiff argues that the Weekly Chapel Reports are inadmissible for purposes of considering Defendants' motion for summary judgment as they are not authenticated by the chapel clerks. (*Id.*) He further argues that the reports are inadmissible hearsay. (*Id.* at 11.)

///

///

---

[24]   In addition to the Weekly Chapel Reports attached to Mr. Walters' declaration, Plaintiff also submits the Weekly Chapel Reports for August 8, 15, and 22, 2016 and May 6, 2019.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.   Authentication

The authentication of a document requires "evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *see also Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532–33 (9th Cir. 2011).  An inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility.  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

Here, the Weekly Chapel Reports have been authenticated through judicial admission as they were produced by Defendants in this action—as confirmed by Plaintiff—and introduced by Plaintiff in support of his opposition.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006) (authentication may be accomplished by judicial admission, such that documents produced during discovery are deemed authentic when offered by a party-opponent) (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996); *In re Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 769, 781 (C.D. Cal. 2004)); *see also Orr*, 285 F.3d at 777 n.20; *Anand v. BP W. Coast Prod. LLC*, 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007).

In addition, the Weekly Chapel Reports have been authenticated through their distinctive characteristics.  *See* Fed. R. Evid. 901(b)(4).  The characteristics of the Weekly Chapel Reports in terms of "appearance, contents, [and] substance . . . taken together with all the circumstances" allow the Court to conclude that the documents are what they appear to be: official prison records.  *Id.*; *see also Las Vegas Sands, LLC*, 632 F.3d at 533 ("Under Rule 901(b)(4), documents . . .  could be authenticated by review of their contents if they appear to be sufficiently genuine." (citation omitted)); *Abdullah v. CDC*, No. CIV S–06–2378 MCE JFM P, 2010 WL4813572, at *3 (E.D. Cal. Nov. 19, 2010) (overruling an objection for lack of authentication where it could not be reasonably disputed that the records were from the plaintiff's prison file or that they were created and maintained by prison officials).

As the Weekly Chapel Reports have been authenticated, the Court overrules Plaintiff's objection to the consideration of the Weekly Chapel Reports for lack of proper authentication.

### 2. <u>Hearsay</u>

Plaintiff also objects to the Weekly Chapel Reports as hearsay. (ECF No. 97 at 11.) Hearsay is an out-of-court statement which is offered to prove the truth of the matter asserted in the statement. *See Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 223 (9th Cir. 2013) (citing Fed. R. Evid. 801(c)). "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807." *Orr*, 285 F.3d at 778 (citing Fed. R. Evid. 802; 30B Federal Practice & Procedure: Evidence § 7031 at 279). Courts in this Circuit have regularly held that prison records fall within the hearsay exception for records of a regularly conducted business activity found in Federal Rule of Evidence Rule 803(6). *See, e.g.*, *Gonzales v. Carrillo*, No. EDCV 11-1028-JAK JPR, 2013 WL 1700964, at *2 (C.D. Cal. Mar. 5, 2013), *adopted by* 2013 WL 1738422 (C.D. Cal. Apr. 18, 2013); *Lancaster v. Amos*, No. 1:09-CV-00683-CWD, 2013 WL 6198281, at *10–11 (D. Idaho Nov. 27, 2013); *Billups v. Ramirez*, No. 1:07-CV-00062-CKJ, 2009 WL 2151389, at *3 (E.D. Cal. July 17, 2009), *aff'd*, 393 F. App'x 492 (9th Cir. 2010).

"Rule 803(6) allows the admission of business records when 'two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity.'" *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 819 (9th Cir. 2002) (quoting *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985)). These facts must be proved through the testimony of the custodian of the records or other qualified witness, though not necessarily the declarant. *Miller*, 771 F.3d at 1237 (citing *United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir. 1983)). "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990), *as amended*

*on denial of reh'g* (Apr. 23, 1991) (finding sufficient a qualified witness where she demonstrated that she was familiar with, and understood, the record keeping system). The record will not be admissible, however, if the opponent shows that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *Miller*, 771 F.3d at 1237 (citing *Ordonez*, 737 F.3d at 805); *see also* Fed. R. Evid. 803(6)(E).

In his declaration, Garnica, the Litigation Coordinator at RJD, states that the Weekly Chapel Report is "regularly created and kept at the prison" and that he is "familiar with it." (ECF No. 96 at 2.) Garnica further states that the report details "the chapel services for various religious groups that were scheduled each week on that facility." (*Id.*) Garnica adds that his office obtained and provided a true and correct copy of the weekly reports for the period from July 25, 2016 to April 29, 2019 to the Office of the Attorney General in this case. (*Id.*) These documents were later produced in discovery to Plaintiff. (ECF No. 87 at 72.) Garnica is available to testify to these facts if called upon to do so. (ECF No. 96 at 1.)

Although Garnica's declaration does not fully lay out the requisite foundational facts for the business records exception, it is sufficient to ensure the Court that Garnica could lay such a foundation at trial. On a motion for summary judgment, a district court may consider inadmissible evidence as long as the evidence could be presented in an admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see also Jeffries v. Las Vegas Metro. Police Dep't*, 713 F. App'x 549, 550 (9th Cir. 2017); *Allision v. Dolich*, 148 F. Supp. 3d 1142, 1145 (D. Or. 2015) (considering payroll registers on a motion for summary judgment even if the qualified witness did not adequately identify the payroll registers as admissible business records because "this flaw may clearly be cured at trial").

Plaintiff suggests that the Weekly Chapel Reports are inaccurate, and more services were cancelled than is indicated on the reports. (*See, e.g.*, ECF Nos. 97 at 83, 113, 116; 97-3 at 80–83.) Plaintiff does not, however, show that the "*source of information* or the

*method or circumstances of preparation* indicate a lack of trustworthiness."  *See* Fed. R. Evid. 803(6)(E) (emphasis added); *see also United States v. Siders*, 712 F. App'x 601, 603 (9th Cir. 2017) ("The content of a record does not impact the way in which it was received, processed, or maintained."); *United States v. Catabran*, 836 F.2d 453, 457–58 (9th Cir. 1988) ("Any question as to the accuracy of the [records] . . . would have affected only the weight of the [records], not their admissibility.").  Rather, as noted above, the weekly sign-in sheets, which Plaintiff claims are true and correct copies of prisoner clerk reports, support the Weekly Chapel Reports.  (*See* ECF No. 97-1 at 72, 105–53.)  As Plaintiff fails to show a lack of trustworthiness, the Court finds that the Weekly Chapel Reports could be admissible under the hearsay exception for records of a regularly conducted business activity at trial.  Accordingly, Plaintiff's hearsay objection in the context of this motion for summary judgment is overruled.

**B.    Res Judicata**

Defendants argue that "Plaintiff's lawsuit is barred by res judicata because he already settled the claims in a prior lawsuit, and expressly waived all past, present, and future claims regarding his alleged lack of access to Buddhist chapel services."  (ECF No. 74 at 8.)  Specifically, Defendants assert that the claims in this action are precluded by the earlier action Plaintiff filed in this District in 2015, *Cejas v. Brown*, Case No. 15-cv-00949-WQH (MDD) (S.D. Cal.) ("2015 Action").  (*Id.* at 8–10.)

1.    2015 Action

On April 29, 2015, Plaintiff filed a separate civil rights action under Section 1983 against defendants R. Brown, W.O. Brown, F. Hadjadj, K. Seibel, G. Murphy, and R.L. Briggs, all of whom were state officials working at RJD. (2015 Action, ECF No. 1 at 1–2, 10–12.)[25]  In a complaint substantially similar to the present one, Plaintiff alleged that the

---

[25]    The Court takes judicial notice of the filings in the 2015 Action.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (noting that courts "may take judicial notice of court filings and other matters of public record").

defendants violated his right to the free exercise of his Buddhist faith under the First Amendment, imposed a substantial burden on the exercise of that faith in violation of RLUIPA, and denied him equal protection of the law under the Fourteenth Amendment, from 2013 through 2015.  (*Id.* at 1–32.)  Plaintiff alleged that he is a sincere practitioner of the Buddhist faith and that the defendants violated his rights by (1) denying Buddhist inmates in Facilities C and D at RJD[26] equal chapel (or other indoor) access to "conduct mandatory meditation, chanting, and prostration," (2) not allowing weekly Buddhist services, and (3) not providing supervision of Buddhist services.  (*See id.* at 8–9, 21–32.) Plaintiff further alleged that the defendants favored other religions with "a guaranteed weekly service and chaplain supervision" and failed to "provide food at state expense for annual Buddhist holidays."  (*Id.* at 25–26, 29.)

Plaintiff further alleged the following: that defendant K. Seibel, as the Chief Deputy Warden, was responsible for policy operations at RJD; defendant R. Brown, the Community Resource Manager at RJD, was responsible for overseeing all religious programs; defendant Hadjadj, a Rabbi at RJD, was responsible for overseeing Buddhist services; defendant W.O. Brown, a chaplain at RJD, had a duty to provide supervision for Buddhist services; and defendants G. Murphy and R.L. Briggs were responsible for the final decision of inmate appeals at the third level.  (*Id.* at 2, 10–12, 23.)

The 2015 Action was settled at an Early Neutral Evaluation Conference held before the Honorable Mitchell D. Dembin on May 4, 2016.  (2015 Action, ECF No. 28.)  On May 12, 2016, the parties signed a Stipulation for Voluntary Dismissal with Prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), as the parties had "resolved th[e]

---

[26]     Based on the information before the Court, it appears that Plaintiff transferred from Facility C to Facility D at RJD in the latter half of 2014.  (*See* ECF No. 97 at 26 ("Plaintiff alleged [in the 2015 Action] that the violation began in 2014 on facility C yard . . . .  [B]y the time Defendants and Plaintiff reached a settlement agreement [in the 2015 Action] Plaintiff was on facility D.").  *Compare* ECF No. 3 at 24 (Housing/Bed Number: C11-140 (7/16/14)), *with id.* at 25 (Housing/Bed Number: D17-212 (11/16/14)).).

case in its entirety." (2015 Action, ECF No. 31.)  Pursuant to the Stipulation, the Honorable William Q. Hayes closed the case on June 29, 2016.  (2015 Action, ECF No. 33.)

The Settlement Agreement ("Agreement") between Cejas and CDCR on behalf of the defendants in the 2015 Action was signed by Cejas on May 12, 2016.  (ECF No. 74-1 at 146.)  The Agreement covered "all of the claims and allegations in the Complaint [filed in the 2015 Action] and any amendments thereto against Defendants, whether named or unnamed and whether served or unserved, and any past or current employees of CDCR." (*Id.* at 144.)

By signing the Agreement, Plaintiff agreed to release "CDCR, Defendants, whether named or unnamed and whether served or unserved, and any past or current CDCR employees from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the Complaint." (*Id.* at 145.)  Plaintiff also expressly waived the provisions of California Civil Code § 1542, which states:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

(*Id.*)

## 2.   Analysis

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *see also Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1164 (9th Cir. 2016).  Under federal common law, the doctrine of res judicata bars the re-litigation of claims previously decided on their merits. *Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 (9th Cir. 2005).  "Res judicata, or claim preclusion, provides that a final judgment on the merits of an action precludes the parties from relitigating all issues . . .  that were or could have been raised in that action." *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 898–99 (9th Cir. 2001).  The elements necessary to establish res judicata are: "(1) an identity of claims, (2) a final judgment on

the merits, and (3) privity between parties." *Headwaters, Inc.*, 399 F.3d at 1052 (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.2d 1064, 1077 (9th Cir. 2003)).

### a.    *Final Judgment on the Merits*

A stipulated dismissal of an action with prejudice in a federal district court constitutes a final judgment on the merits and precludes a party from reasserting the same claims in a subsequent action in the same court. *Id.* at 1052 n.4 (finding that a stipulated dismissal with prejudice in a federal court bars refiling of the same claim in the same district court). The parties in the 2015 Action filed a stipulated dismissal with prejudice in this District. (2015 Action, ECF No. 31.) Therefore, the stipulation constitutes a final judgment on the merits for purposes of res judicata. Moreover, the parties' resolution of their claims by way of a settlement agreement constitutes a final judgment on the merits. *See Int'l Union of Operating Eng'rs–Emps. Constr. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993) ("*Karr*") (finding that dismissal of action with prejudice pursuant to a settlement agreement was a final judgment on the merits preventing reassertion of same claim in subsequent action); *Green v. Ancora-Citronelle Corp.*, 577 F.2d 1380, 1383 (9th Cir. 1978) (finding that the fact a judgment "was the result of the parties' stipulation of settlement does not detract from its being considered a conclusive determination of the merits of that action for purposes of collateral estoppel where . . . it is clear that the parties intended the stipulation of settlement and judgment entered thereon to adjudicate once and for all the issues raised in that action" (citing 1B J. Moore & T. Currier, *Moore's Federal Practice* ¶ 0.444(1) (2d ed. 1974))).

Based on the foregoing, the Court finds that there was a final judgment on the merits for purposes of res judicata.

### b.    *Privity Between Parties*

Generally, a person who is not a party to an action is not entitled to the benefits of res judicata. However, where "two parties are so closely aligned in interest that one is the virtual representative of the other, a claim by or against one will serve to bar the same claim

20

by or against the other." *Nordhorn v. Ladish Co., Inc.*, 9 F.3d 1402, 1405 (9th Cir. 1993). "There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the [government] is res judicata in relitigation of the same issue between that party and another officer of the government." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940); *see also Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

Here, the plaintiff is the same in both cases, as well as two of the defendants–R. Brown and F. Hadjadj.  Although J. Davies and P. Covello were not defendants in the 2015 Action, the Court finds that there is privity because Plaintiff sued all of the defendants in both cases in their official capacity as CDCR representatives.  Moreover, it is clear that the defendants are interchangeable as government representatives.  (*Compare* ECF No. 1 at 2 (suing P. Covello in his capacity as Chief Deputy Warden of RJD), *with* 2015 Action, ECF No. 1 at 10 (suing K. Seibel in his capacity as Chief Deputy Warden at RJD).)  Accordingly, the Court finds that there is privity between parties for purposes of res judicata.

c.   <em>Identity of Claims</em>

In determining whether a present dispute concerns the same claims as those asserted in prior litigation, the Ninth Circuit considers:

> (1) [W]hether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.  The last of these criteria is the most important.

*Headwaters Inc.*, 399 F.3d at 1052 (alteration in original) (quoting *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir. 1982); *see also Karr*, 994 F.2d at 1430 (noting that "the factors cited in *Costantini* are 'tools of analysis, not requirements'" (quoting *Derish v. San Mateo–Burlingame Bd. of Realtors*, 724 F.2d 1347, 1349 (9th Cir. 1983))).

18-cv-00543-WQH (JLB)

The two suits–the present one and the 2015 Action–clearly involve alleged infringement of the same rights, *i.e.*, violations of the Free Exercise Clause of the First Amendment, RLUIPA, and the Equal Protection Clause of the Fourteenth Amendment. However, nothing before the Court shows how prosecution of this action would impair the rights or interests established in the 2015 Action.[27]

It is further apparent that new and different evidence would be presented in this action. The evidence before the Court on Defendants' motion for summary judgment post-dates the settlement in the 2015 Action. For example, Defendants attach Weekly Chapel Reports for the period from July 25, 2016 to April 29, 2019. (*See* ECF No. 74-1 at 1–2.) The 2015 Action, however, was settled on May 4, 2016 and closed on June 29, 2016. (2015 Action, ECF Nos. 28; 33.)

In fact, the adjudication of the present case need not involve any evidence that predates 2016. Plaintiff's allegations only relate to the time period from 2016 through 2018 and to the present. (*See* ECF No. 1 at 1, 25–34.) In addition, on May 13, 2017, Plaintiff submitted a CDCR 22 form to defendant Brown regarding the failure to provide weekly Buddhist services on May 8, 2017, as well as April 3, 10, and 17, 2017. (ECF No. 3 at 15.) Thereafter, Plaintiff submitted a CDCR 602 appeal, dated June 12, 2017, referencing and attaching his earlier CDCR 22 form. (*Id.* at 4.) The CDCR 602 appeal, assigned Log No. 17-3023, requested the following: (1) that defendant Brown, as the supervisor, respond to his CDCR 22 form; and (2) provision of weekly, supervised chapel access by a CDCR chaplain or an inmate minister or other persons if the chaplain or Buddhist volunteers are unavailable, or provision of an alternative indoor area for weekly Buddhist services. (*Id.*; ECF No. 97 at 268–69.) In a reply to the first level response, dated July 25, 2017, Plaintiff stated that there had not been weekly Buddhist services in "over 6

---

[27]     Notably, nothing before the Court suggests that the terms and conditions of the Agreement, which called for financial payment to Cejas but no injunctive relief, have been breached.

months (2017)."  (ECF No. 3 at 6.)  Plaintiff relies on this CDCR 602 appeal to exhaust the claims in his present complaint.  (*See* ECF No. 1 at 18–19.)  Accordingly, nothing before the Court suggests that Plaintiff's current claim arose or will require examination of any evidence prior to 2016.[28]

Based on the foregoing, the Court concludes the two suits do not arise out of the same transactional nucleus of facts, as the alleged infringements occurred at different times.  "It is well established . . . that the difference in timing means that the two situations do not involve the same 'claim' for claim-preclusion purposes, even if all the conduct is alleged to be unlawful for the same reason."  *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1365 (Fed. Cir. 2017); *accord Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("A claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim.").[29]

Defendants argue that there is an identity of claims because the suits overlap—Plaintiff alleged in the 2015 Action that the violations occurred "[f]rom 2013 through 2015

---

[28]    Arguably, Plaintiff has not exhausted any claims dating back to 2016, but Defendants have not raised this issue before the Court.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007) (holding that "failure to exhaust is an affirmative defense under the PLRA"); *Albino*, 747 F.3d at 1171 ("[T]he defendant in a PLRA case must plead and prove nonexhaustion as an affirmative defense."); *see also* Cal. Code Regs., tit. 15 §§ 3084.2, 3084.8 (repealed 2020) (An inmate begins the CDCR administrative review process by submitting, within thirty days of the adverse action, a CDCR form 602 inmate appeal describing the adverse action challenged); *Galvan v. Lucas*, No. 1:18-cv-00688-NONE-SAB PC, 2020 WL 996649, at *6 (E.D. Cal. Mar. 2, 2020), *adopted by* 2020 WL 4287410 (E.D. Cal. July 27, 2020) (same).

[29]    *See also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) (holding that the development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim for purposes of res judicata); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (stating that a judgment that "precludes recovery on claims arising prior to its entry" nonetheless "cannot be given the effect of extinguishing claims which did not even then exist").

and now [as of April 29, 2015]" (2015 Action, ECF No. 1 at 23) and were purportedly "ongoing." (ECF No. 74 at 9–10.)  The Court disagrees with this position.  Plaintiff filed his 2015 Action based on events that occurred from 2013 to 2015.  He thereafter presented no evidence in the 2015 Action regarding violations in 2016.  Moreover, even if there was a continuing course of a similar type of conduct, that is insufficient to establish identity of claims.  *See Whole Woman's Health*, 136 S. Ct. at 2305; *Frank*, 216 F.3d at 851; *see also Chudacoff v. Univ. Med. Ctr.*, 525 F. App'x 530, 532 (9th Cir. 2013) ("The fact that some of the events from which the claims in *Chudacoff II* arise occurred prior to entry of judgment in *Chudacoff I* does not dictate dismissal based on claim preclusion." (citing *Lawlor*, 349 U.S. 322)).  The inquiry into whether two suits arise out of the same transactional nucleus of facts "is essentially the same as whether the claim could have been brought in the first action."  *Turtle Island Restor. Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) (quoting *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir. 2011)).  Here, the alleged violations by Defendants in this action could simply not have been brought in the first action as they had not yet occurred.[30]

For the foregoing reasons, the Court finds that Defendants have failed to establish that Plaintiff's complaint is barred by res judicata.

## C.  Declaratory and Injunctive Relief and RLUIPA

In his Prayer for Relief, in addition to monetary damages, Plaintiff seeks declaratory and injunctive relief specific to RJD.  (ECF No. 1 at 34–36.)  Defendants argue that Plaintiff's transfer to Avenal State Prison in November 2019 moots his claims for non-monetary relief brought under Section 1983 and his entire RLUIPA claim, as RLUIPA

---

[30]    *See Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021–22 (9th Cir. 2019) ("[C]laim preclusion does not apply to claims that were not in existence and could not have been sued upon—*i.e.*, were not legally cognizable—when the allegedly preclusive action was initiated."); *see also Howard v. City of Coos Bay*, 871 F.3d 1032, 1039–40 (9th Cir. 2017) (collecting cases).

does not provide for awards of monetary damages against prison officials.[31]  (ECF No. 74 at 11, 13.)  In response, Plaintiff argues that his claims for injunctive relief should not be dismissed because he will be transferred back to RJD for trial in Case No. 14-cv-01923-WQH (WVG) (S.D. Cal.) ("2014 Action") and possibly this case.  (ECF No. 97 at 30.)

Generally, when an inmate is transferred, an individual claim for injunctive relief against the inmate's former prison becomes moot.  *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995).[32]  The same is true for claims seeking declaratory relief.  *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (citing *Rhodes v. Stewart*, 488 U.S. 1, 2–4 (1988) (per curiam)).  The reason is that the transferred inmate is no longer subject to the prison conditions or policies he challenges.  *Id.*  Here, because Plaintiff's claims only challenge the conditions at RJD, unless an exception to the mootness doctrine applies, Plaintiff's claims under Section 1983 for injunctive and declaratory relief and his entire RLUIPA claim[33] are moot.

A claim that is "capable of repetition, yet evading review" is an exception to the mootness doctrine.  *See Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985) (citing

---

[31]    Injunctive relief is available under RLUIPA, but damages are not.  *Wood v. Yordy*, 753 F.3d 899, 901 (9th Cir. 2014) (holding that a plaintiff may not seek damages under RLUIPA against prison officials in their individual capacities); *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1114 (9th Cir. 2010) ("The Eleventh Amendment bars [the plaintiff's] suit for official-capacity damages under RLUIPA."); *see also Jones*, 791 F.3d at 1031.

[32]    *But see Nelson v. Heiss*, 271 F.3d 891, 893, 897 (9th Cir. 2001) (concluding that an inmate's claim would not be moot upon transfer where the policy pursuant to which the alleged violation occurred was "system wide" and one of the defendants was in charge of the policy); *Walker v. Beard*, 789 F.3d 1125, 1132 (9th Cir. 2015) (same).

[33]    *See Jones*, 791 F.3d at 1031 (finding the plaintiff's RLUIPA claims for injunctive relief moot because he has been released from custody and the record discloses no evidence of continuing effects of the alleged violations and no reasonable expectation of future violations); *Harris v. Escamilla*, 736 F. App'x 618, 621 (9th Cir. 2018) (finding the plaintiff's declaratory and injunctive relief claims under RLUIPA moot where he was moved to a new prison facility and he does not allege any statewide policy impacting his religious activities that would affect him at the new facility).

*Roe v. Wade*, 410 U.S. 113, 125, *reh'g denied*, 410 U.S. 959 (1973*); S. Pac. Terminal Co. v. ICC*, 219 U.S. 498 (1911)).  This exception "is limited to extraordinary cases where two elements combine: (1) the challenged action is of limited duration, too short to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again."  *Id.* (citations omitted).  For a controversy to be "too short to be fully litigated prior to cessation or expiration, it must be of *inherently* limited duration."  *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (citation and internal quotation marks omitted).  "This is so because the 'capable of repetition, yet evading review' exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review."  *Id.* (citation omitted).  Cases are "inherently limited in duration" when "they will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible."  *Id.*

Plaintiff argues that there is a reasonable expectation that he will be subjected to the same action again because he will be transferred back to RJD for trial in the 2014 Action and possibly this case.  (ECF No. 97 at 30.)  The Court takes judicial notice of the docket in Plaintiff's 2014 Action[34] and finds that it is more than purely speculative that Plaintiff will be transferred back to RJD.  However, based on the Court's review of the Weekly Chapel Reports in 2019, there is no reasonable expectation that Plaintiff will be subjected to the same action—rising to the level of actionable misconduct—again.  Moreover, Plaintiff cannot satisfy the second prong of the "capable of repetition, yet evading review" exception, because the nature of the claims here, RJD substantially burdening Buddhist inmates' religious practices, is not of limited duration, too short to be fully litigated prior to its cessation or expiration.  Plaintiff's claims for non-monetary relief brought under Section 1983 and his RLUIPA claim are therefore moot.

---

[34]    *See Reyn's Pasta Bella, LLC*, 442 F.3d at 746 n.6.

Based on the foregoing, Defendants are entitled to summary judgment on Plaintiff's claims for non-monetary relief brought under Section 1983 and his entire RLUIPA claim. Accordingly, the Court **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment with respect to Plaintiff's Section 1983 declaratory and injunctive relief claims and his RLUIPA claim.

### D.   First Amendment Free Exercise Clause

Defendants argue they are entitled to summary judgment on Plaintiff's First Amendment free exercise claim because the "occasional cancellation of chapel access did not substantially burden Plaintiff's exercise of Buddhism." (ECF No. 74 at 11–12.) Defendants further argue that even if the Court finds that Defendants violated the First Amendment, they are entitled to qualified immunity. (ECF No. 74 at 15–16.)

### 1.   Legal Standard

The Free Exercise Clause of the First Amendment "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Inmates clearly retain protections afforded by the First Amendment including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).

"To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). First, an inmate must show that his religious belief is "sincerely held." *Id.* (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)). Second, the inmate must demonstrate that his claim is "rooted in religious belief, not in 'purely secular' philosophical concerns." *Id.* (quoting *Callahan*, 658 F.2d at 683). To be deeply rooted in religious belief, an inmate's claim need not be compelled by or central to his religion. *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981) ("The guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."); *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (noting that the "sincerity test" and not the "centrality test" applies to a free exercise analysis). Instead,

"[d]etermining whether a claim is 'rooted in religious belief' requires analyzing whether the [inmate]'s claim is related to his sincerely held religious belief." *Malik*, 16 F.3d at 333 (quoting *Callahan*, 658 F.2d at 683–84).

Once the inmate makes this initial showing, he must then establish that a prison official's actions "substantially burdens [the] practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013) (quoting *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (internal quotation marks and alterations omitted)).

The free exercise right, however, is necessarily limited by the fact of incarceration and may be curtailed to achieve legitimate correctional goals or to maintain prison security. *O'Lone*, 482 U.S. at 348–49. Even when a prison policy or practice substantially burdens an inmate's religious exercise, it will not violate the First Amendment if the government can demonstrate that the policy or practice "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 79, 89 (1987), *superseded on other grounds as stated in Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005); *see also Jones*, 791 F.3d at 1032.

### 2.   Discussion

#### a.   *Plaintiff's Sincerely Held Religious Beliefs*

Plaintiff practices the Buddhist faith. (ECF No. 97 at 71.) In practicing his religion, Plaintiff contends that he requires the ability to engage in indoor group worship with other Buddhists on a weekly basis. (*Id.*) Plaintiff claims this is a sincerely held religious belief. (*Id.*) There is nothing in the record before the Court which challenges the sincerity of Plaintiff's faith or his religious belief in indoor weekly group worship. Accordingly, the Court finds this aspect of the case is not in dispute and turns to the next criteria.

///

b.    *Substantial Burden*

Plaintiff claims that Defendants substantially burdened his ability to engage in indoor group worship with other Buddhists on a weekly basis in two ways.  First, Plaintiff claims that weekly scheduled services at RJD required supervision.  (ECF No. 97 at 8, 40–42.)  Therefore, Defendants substantially burdened the practice of his Buddhist faith when they failed to provide "chaplain supervision, prison officer supervision, volunteer supervision, and/or inmate minister supervision" for scheduled Buddhist services on a weekly basis.  (*Id.* at 4, 71–72.)  Second, Plaintiff claims that Defendants substantially burdened the practice of his Buddhist faith when they failed to provide any "alternative indoor area for exercising group worship."  (*Id.* at 6–8, 71–72.)  Plaintiff asserts that Facility D had other indoor areas that could have been used for mandatory group worship, including "the library, gym, eating areas, and dayrooms when supervision was not available."  (*Id.* at 9, 71–72.)  However, Defendants "did not provide a readily available alternative to group worship" as "Plaintiff and other Buddhist prisoners did not have another area or place to assemble in a group with or without supervision."  (*Id.* at 42.)  Plaintiff claims the "only place available to assemble in a group was the chapel."  (*Id.*)  Plaintiff further claims that he could not engage in "group worship" in his cell because his religion mandated assembly in a group with other Buddhist members.  (*Id.* at 43.)

In their motion for summary judgment, Defendants argue that Plaintiff cannot establish that he was substantially burdened in the practice of his faith.  (ECF No. 74 at 12.)  Defendants contend that they provided "both Buddhist volunteers and regular weekly access to the chapel for Buddhist services."  (*Id.*)  Defendants claim that Plaintiff received chapel access two out of every three weeks on average and when chapel was cancelled, it was for a variety of reasons, such as holidays, weather, security and programming issues with the prison, and absences by volunteers.  (*Id.*)  Defendants argue that the occasional cancellation of chapel access did not substantially burden Plaintiff's exercise of Buddhism or cause him to violate his religious beliefs.  (*Id.*)

///

Defendants summarize RJD's Weekly Chapel Reports as follows:

[T]he records show that Buddhist services were provided in the chapel on 65% of the weeks from July 2016 to May 2019.  For example, Buddhist chapel services occurred on fifteen of twenty-one available weeks from July through December 2016 (71%); on thirty-six of fifty-three available weeks in 2017 (67%); on twenty-eight of fifty-two available weeks in 2018 (53%); and on fourteen of seventeen available weeks from January to May 2019 (82%). (Ex. 4.)  In short, Plaintiff complains about occasional cancellations of the weekly Buddhist chapel service.  Further, some of the cancellations were the results of holidays, weather, and prison security and program issues – not staffing and volunteer issues.  (Ex. 4.)  Finally, Buddhist volunteers attended most of the services.  (Ex. 4.)

(ECF No. 74 at 7.)

The Court's review of the evidence presented indicates that for the 146-week period from July 25, 2016 through May 6, 2019, Buddhist services were not held due to: (1) documented "no shows" on approximately 28 occasions; (2) holidays (including non-Buddhist holidays) on approximately 7 occasions; (3) no programs/services/lists from program office on approximately 8 occasions; and (4) bad weather on 1 occasion.  There are an additional 3 occasions for which the records are unclear, but for which Plaintiff denies services were held and Defendants fail to establish services occurred.  Accordingly, based on the evidence before the Court, Defendants have established that Buddhist services were held in approximately 99 out of 146 weeks presented or 68% of the time.[35]  Services were not held on 47 of the 146 weeks, or the remaining 32% of the time.  Plaintiff

---

[35]     Plaintiff contends that his claims date back to the beginning of 2016 and Defendants have produced no evidence from January 1, 2016 through July 25, 2016. (ECF No. 97 at 10.)  Plaintiff submits contemporaneous CDCR 22 form records indicating that services occasionally did not occur during this period.  (*See* ECF No. 97-2 at 98–100.)  Plaintiff also contends that additional services were not held that are not reflected in the Weekly Chapel Reports, but he does not provide any evidence on which the Court can rely to support his claims.  (ECF Nos. 97 at 72; 97-2 at 81–83.)

commenced this action on March 15, 2018.   (ECF No. 1.)   Since that date, Buddhist services have been held approximately 76% of the time.

Although the cancellation of Buddhist services could be sporadic, on occasion it occurred nearly every week.   For example, in the 17 weeks between March 27, 2017 and July 17, 2017, Buddhist chapel service was only held 5 times.   In other words, it was cancelled in 12 out of the 17 weeks.   Again, in the 25 weeks between December 4, 2017 and May 21, 2018, Buddhist chapel service was only demonstrably held 6 times.   In other words, it was cancelled in 19 out of the 25 weeks.

"[G]overnment action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego h[is] sincerely held religious beliefs or to engage in conduct that violates those beliefs."   *Jones*, 791 F.3d at 1033.   Defendants argue that their actions did not place a substantial burden on Plaintiff's exercise of his Buddhist faith.   Specifically, Defendants argue that Plaintiff "cannot show" that he was ever prevented from engaging in conduct which he sincerely believes is consistent with his faith.   (ECF No. 74 at 12 (citing *Malik*, 16 F.3d at 333).)   Defendants further argue that "[t]here is no evidence that missing one out of three weekly services caused Plaintiff to violate his religious beliefs."   (*Id.* at 6.)

Here, the Ninth Circuit's decision in *Canell v. Lightner*, 143 F.3d 1210 (9th Cir. 1998) is instructive.   In *Canell*, the plaintiff alleged that Lightner, a licensed minister in the Church of God, violated his First Amendment rights by actively seeking to convert him to his Christian faith.   *Id.* at 1211–12.   The alleged violations occurred during a ten-week period when the plaintiff was held in a pretrial detention center.   *Id.* at 1211–12.   For six weeks of that time, Lightner worked three nights a week as a correctional officer in the plaintiff's housing unit.   *Id.* at 1211.   The plaintiff alleged that Lightner regularly brought his Bible to work and placed it in the inmates' plain view and engaged in religious debate and discussion with inmates, performed mock preaching, and sang Christian songs while on duty.   *Id.*   The plaintiff further alleged that Lightner disturbed his Muslim prayers by

singing Christian songs or preaching.  *Id.* at 1212.  During the six weeks Lightner worked in the module which housed the plaintiff, he only worked a maximum of eighteen days.  *Id.*

The Ninth Circuit affirmed summary judgment in favor of Lightner on the plaintiff's free exercise claim that Lightner's "mock-preaching and espousal of religious views interfered with [his] efforts to pray," holding that "Lightner's alleged activities do not constitute a substantial burden on [the plaintiff's] free exercise of his religion."  *Id.* at 1214–15.  In so holding, the Ninth Circuit noted that the plaintiff's "only allegation is that on some occasions Lightner interfered with his prayer activities by preaching about Christian gospel."  *Id.* at 1215.  It further reasoned that "[w]hile Lightner's evangelizing may have constituted an intrusion upon [the plaintiff's] prayers on some occasions during the brief period involved, we agree with the district court's conclusion that these intrusions were 'relatively short-term and sporadic' and did not constitute a substantial interference."  *Id.*

Relying on *Canell*, courts have consistently held that an isolated or sporadic interference does not substantially burden the free exercise of religion.  *See Brown v. Washington*, 752 F. App'x 402, 405 (9th Cir. 2018) (holding that "a one-time set of circumstances amounting to no more than an unintentional interference" with the plaintiff's ability to exercise his religious beliefs was an "isolated incident" and "not enough to constitute a substantial burden of plaintiff's religious beliefs");[36] *Randolph v. Baker*, No. 3:17-cv-00506 MMD WGC, 2019 WL 7880031, at *7 (D. Nev. Oct. 18, 2019) (collecting cases), *adopted by* 2019 WL 6790297 (D. Nev. Dec. 12, 2019); *Whitely v. CDCR*, No. 2:16-cv-1534 KJM-EFB P, 2019 WL 931835, at *4 (E.D. Cal. Feb. 26, 2019) (collecting cases); *Chaparro v. Ducart*, No. C 14-4955 LHK (PR), 2016 WL 491635, at *5 (N.D. Cal. Feb. 9, 2016) (granting defendants' motion for summary judgment because four missed

---

[36]    *Cf. Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) (addressing whether the prison's prohibition on group worship constituted a substantial burden under RLUIPA and finding "little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise").

weekly chapel services in a month on one occasion did not amount to a substantial burden on the plaintiff's right to the free exercise of religion as they were "temporary" and "short-term" amounting to a "temporary prohibition of attending chapel services"), *aff'd*, 695 F. App'x 254 (9th Cir. 2017).

Based on the foregoing, the Court finds that Plaintiff has raised a genuine dispute of material fact as to whether there was a substantial burden on the exercise of his faith. Specifically, Plaintiff has raised a genuine dispute of material fact as to whether the failure to make available an indoor location for Buddhist services on a consistent weekly basis coerced Plaintiff to forego his sincerely held religious belief in weekly indoor group worship. The failure was not, as Defendants suggest, occasional. Rather, the failure was, at times, frequent and there is a genuine dispute of material fact as to whether it had the effect of coercing Plaintiff into acting contrary to his religious beliefs. *See Ohno*, 723 F.3d at 1011.[37] The repeated failure was also not an isolated incident or temporary prohibition. After Buddhist services were cancelled for 12 out of 17 weeks in the first half of 2017, they were cancelled for 19 out of 25 weeks in the first half of 2018.

///

---

[37] The Court agrees with Defendants that they were not required to provide Plaintiff with a Buddhist chaplain or a chaplain of his choosing. *See Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) ("[I]t is well-settled that the First Amendment does not require prison administration to provide inmates with the chaplain of their choice."), ECF No. 74 at 11–12. The Free Exercise Clause does not require prison administration to provide inmates with *more* than staff chaplains and volunteers. *Id.* at 1123. However, Plaintiff does not claim he is entitled to a Buddhist chaplain. (*See* ECF No. 97 at 62 ("Plaintiff pointed out that Buddhist chaplain could be an alternative accommodation for supervision.").) Rather, he suggests that having one would potentially ensure weekly services. (*Id.* at 8.) Plaintiff also suggests other alternative means of ensuring weekly services, including an inmate minister or another approved indoor location. (*Id.* at 8–9.) In other words, Plaintiff's free exercise claim does not focus on the method (*e.g.*, location, supervisor), so much as the outcome—having a weekly group Buddhist service indoors. (*See id.* at 62 ("Plaintiff does not claim weekly access to the chapel, but week[ly] access to Buddhist group services[.]").)

1

### c.   *Turner Analysis*

2      The Court's analysis does not, however, stop there.   The free exercise right is

3  necessarily limited by the fact of incarceration and may be curtailed to achieve legitimate

4  correctional goals or to maintain prison security.   *O'Lone*, 482 U.S. at 348–49.   Thus, even

5  when a prison policy or practice substantially burdens an inmate's religious exercise, it will

6  not violate the First Amendment if the government can demonstrate that the policy or

7  practice "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

8      The test for determining whether prison regulations or official acts impinged on

9  Plaintiff's constitutional right to free exercise of his religion is set forth in *Turner* and

10  requires the Court to consider four factors in determining whether a prison regulation is

11  reasonably related to legitimate penological interests: (1) whether there is a valid rational

12  connection between the prison regulation and the legitimate government interest put

13  forward to justify it;[38] (2) whether there are alternative means of exercising the right that

14  remain open to prison inmates; (3) whether accommodation of the asserted constitutional

15  right will impact guards and other inmates or prison resources generally; and (4) whether

16  there is an absence of ready alternatives versus the existence of obvious, easy alternatives.

17  *Shakur*, 514 F.3d at 884 (quoting *Turner*, 482 U.S. at 89–90).   In conducting this analysis,

18  courts are to give significant deference to the views of prison officials in light of the

19  "inordinately difficult" nature of prison operation.   *Turner*, 482 U.S. at 84–85.   Moreover,

20  while "[t]he exercise of discretion . . . may produce seeming 'inconsistencies,' . . .

21  inconsistent results are not necessarily signs of arbitrariness or irrationality." *Thornburgh*

22  *v. Abbott*, 490 U.S. 401, 416 n.15 (1989).

23

24

25

---

26      [38]      "The first *Turner* factor is a *sine qua non*: '[I]f the prison fails to show that

27  the regulation is rationally related to a legitimate penological objective, we do not consider

28  the other factors.'" *Hrdlicka v. Reniff*, 631 F.3d 1044, 1051 (9th Cir. 2011) (quoting *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003)).

34

Here, Defendants have not addressed any of the factors set forth in *Turner*. Defendants have not offered any evidence or argument regarding a legitimate penological interest for the cancellation of nearly a third of weekly Buddhist services on Facility D at RJD over a nearly three-year period.  Defendants have also not offered any evidence or argument addressing whether alternative means existed for Plaintiff to practice his religion and the impact of those accommodations.  Accordingly, the Court finds that Defendants have failed to establish there is no genuine dispute of material fact as to whether they violated Plaintiff's First Amendment rights under the Free Exercise Clause.

### d.   *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Stanton v. Sims*, 571 U.S. 3, 4–5 (2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Courts analyze two prongs to determine whether qualified immunity applies: officers have qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *Easley v. City of Riverside*, 890 F.3d 851, 855 (9th Cir. 2018) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).  "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted).  This standard protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 341 (1986).

Here, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's First Amendment free exercise claim.  The unlawfulness of Defendants' conduct was not clearly established at the time of the events alleged in the complaint.  Although "[i]t was well established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to

coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs," *Jones*, 791 F.3d at 1033, it was also well-established in 1998 that intrusions that are "relatively short-term and sporadic," do not constitute substantial interference.  *Canell*, 143 F.3d at 1215.  In *Canell*, the intrusions, which included, *inter alia*, mock preaching and singing Christian hymns over the inmate's Muslim prayers, occurred occasionally on no more than eighteen days over a six-week period of time.  Thus, in *Canell*, the interference was more direct but for a shorter duration of time than in the present case, and those intrusions were determined not to constitute a substantial burden on the inmate's free exercise of religion.  The only other clear guidance[39] falls on the opposite end of the spectrum: it was well-established at the time of the events alleged in the complaint that "an outright ban on a particular religious exercise is a substantial burden on that religious exercise."  *Greene*, 513 F.3d at 988.  However, that is not what occurred here.  Defendants made an effort to provide weekly Buddhist services and provide supervision, including appointing a supervising chaplain and obtaining volunteers.  (*See* ECF No. 97-2 at 69–70.)  There was no clearly established law at the time of Defendants' actions holding that failing to accommodate Plaintiff's religious practices in the manner and to the extent at issue here constitutes an unlawful, substantial burden on the free exercise of religion.

Defendants are therefore entitled to qualified immunity on Plaintiff's First Amendment claim.[40]  Accordingly, the Court **RECOMMENDS** that the District Court

---

[39]    *See Chaparro*, 2016 WL 491635, at *11 (noting the "lack of clear case law establishing that the Free Exercise Clause prohibits prisons from temporarily denying inmates the right to attend chapel services").

[40]    "Qualified immunity is only an immunity from a suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief."  *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012).  However, as set forth above, the Court recommends that the District Court grant summary judgment on Plaintiff's Section 1983 declaratory and injunctive relief claims.

**GRANT** Defendants' motion for summary judgment with respect to Plaintiff's First Amendment free exercise claim.

### E.   Fourteenth Amendment Equal Protection Clause

Finally, the Court turns to Defendants' argument that they are entitled to summary judgment on Plaintiff's equal protection claim.  (ECF No. 74 at 14–15.)

#### 1.   Legal Standard

The Fourteenth Amendment Equal Protection Clause prohibits the states from denying any person the equal protection of the laws, with the general objective "that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  A viable equal protection claim under § 1983 requires a prisoner to show that the defendant acted with an intent or purpose to discriminate against the prisoner based on membership in a protected class.  *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citing *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), *cert. denied*, 525 U.S. 1154 (1999)).  The "intent" component of a discrimination claim requires the prisoner to demonstrate that "the defendant acted at least in part *because of* [the prisoner]'s protected status."  *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).

In the religious exercise context, "[p]risoners enjoy religious freedom and equal protection of the law subject to restrictions and limitations necessitated by legitimate penological interests."  *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citing *Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979)), *overruled on other grounds by Shakur*, 514 F.3d at 884–85.  "[P]rison officials cannot discriminate against particular religions," and "must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'"  *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).  However, "prisons need not provide identical facilities or personnel to different faiths."  *Id.* (citation omitted).  Rather, prisons "must make 'good faith accommodation of the [prisoners'] rights in light of practical considerations.'"  *Id.* (quoting *Allen v. Toombs*, 827 F.2d 563, 569 (9th

Cir. 1987)) (alteration in original).   To defeat summary judgment on a religious discrimination claim, the prisoner must set forth specific facts showing that there is a genuine dispute "as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and that such conduct was intentional." *Id.*

### 2.   Discussion

In his complaint, Plaintiff alleges that from "2016 through 2018 and now," Defendants intentionally discriminated against Buddhists by not scheduling weekly services, by not providing weekly chapel access, and by not providing chaplain supervision every week, as compared to other similarly situated religious groups.  (ECF No. 1 at 33.) Plaintiff alleges that Defendants provided weekly chaplain supervision to other similarly situated religious groups.  (*Id.* at 33–34.)

In their motion for summary judgment, Defendants argue generally that "Plaintiff's claim fails because he cannot even establish that there was discrimination, let alone intentional discrimination, or that Defendants each engaged in such actions towards [Buddhist inmates]."  (ECF No. 74 at 14.)  In response, Plaintiff argues that while he was denied access to weekly Buddhist services, prisoners of other faiths were allowed to attend services with or without supervision by Defendants.  (ECF No. 97 at 55.)  Plaintiff further contends that each Defendant intentionally and arbitrarily discriminated against Buddhist inmates as follows: Covello and Davies knew about the impending violations and failed to prevent cancellation of Buddhist services, and although they directed Hadjadj to supervise Buddhist services, he refused; Hadjadj was directed to supervise Buddhist services, but he refused to supervise them because it was not his religious faith; and Brown was responsible for the supervision of Hadjadj.  (*Id.* at 56–58.)

Based on its review of the Weekly Chapel Reports submitted by Defendants, the Court finds that there is nothing to substantiate Plaintiff's claim of discrimination such that other religions received chapel access every week and Buddhists did not.  There does not appear to be a single week where every religious group but Buddhists received services. (*See* ECF No. 74-1 at 4–159.)  Moreover, cancellations for "no shows" and "no clerks" and

"not scheduled" and "no program," as well as holidays cancellations occurred across all religions.  (*See id.*)[41]

In response, Plaintiff has not set forth specific facts showing that there is a genuine dispute "as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths."  *Freeman*, 125 F.3d at 737.  Defendants are therefore entitled to summary judgment on Plaintiff's equal protection claim.  Accordingly, the Court **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment equal protection claim.

## IV.   CONCLUSION

For the reasons discussed above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) adopting this Report and Recommendation; (2) **GRANTING** Defendants' motion for summary judgment.

**IT IS ORDERED** that no later than **October 23, 2020**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 6, 2020**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those

///

///

---

[41]     Furthermore, the Equal Protection Clause does not require that all prisoners receive identical treatment and resources. *Hartmann*, 707 F.3d at 1123.  In *Hartmann*, the Ninth Circuit held that the plaintiffs' allegation that prison administrators intentionally and willfully disregarded their rights by denying them a paid full-time Wiccan chaplain was insufficient to establish an Equal Protection Clause violation as there was "access to a volunteer Wiccan chaplain and staff chaplains of other religions." *Id.*

objections on appeal of the Court's order. *See Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  September 30, 2020

Hon. Jill L. Burkhardt
United States Magistrate Judge